IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

IN RE: MEYER'S BAKERIES, INC.,                    CASE  NO.  4:05-bk-70837M
                                                  (CHAPTER 7)
                    Debtor.

RICHARD L. COX, TRUSTEE                                            PLAINTIFF

VS.                              AP NO. 4:07-ap-7281

DECAS CRANBERRY PRODUCTS, INC.                                    DEFENDANT


<u>MEMORANDUM OPINION</u>

On February 6, 2005, Meyer's Bakeries, Inc. (Debtor) filed a voluntary petition for relief

under the provisions of Chapter 11 of the United States Bankruptcy Code.  On March 23, 2006,

the case was converted to Chapter 7 and Richard L. Cox was appointed Trustee (Trustee).  On

July 6, 2007, the Trustee filed this adversary proceeding against Decas Cranberry Products, Inc.,

(Decas) to recover three pre-petition transfers totaling $32,472.00 as preferential transfers

pursuant to 11 U.S.C. § 547 (2005).[1]   Decas filed a timely answer denying the Trustee's

allegations in general and raising the affirmative defense of ordinary course of business as

provided in 11 U.S.C. §547(c)(2)(A).  Decas also disputed that a preferential transfer occurred at

all because of the terms of the Perishable Agricultural Commodities Act contained in 7 U.S.C. §

499.  Decas pleaded other defenses but did not pursue them at trial.

---

[1]This section was amended by the provisions of BAPCPA, Public Law No. 109-9,
Section
     409, but the amendments apply to cases filed after October 17, 2005.  This case was filed
     before that date; therefore, the amendments do not apply.

1

Trial of the above captioned matter was held in Texarkana, Arkansas, on August 5, 2008, after which the matter was taken under advisement.  The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).  The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I.  BACKGROUND

Decas is located in the State of Massachusetts and sells cranberries to wholesale customers.  (Def.'s Ex. 12 & Tr. at 80.)  Decas owns cranberry bogs and also contracts with independent growers. (Tr. at 59.)  Decas has been in business for over 70 years.  (Tr. at 89.)  The total sales of cranberries in one year is about 40 million pounds.  (Tr. at 69.)   The Debtor operated a commercial bakery in Hope, Arkansas, and purchased cranberries from Decas and used the product as an ingredient in English muffins.  (Tr. at 48 & 52.)

According to the printed provisions on the invoices used by Decas, payment was expected 30 days from the date of the invoice and any unpaid invoice over 30 days old was subject to a service charge of 1.5% per month.  (Pl.'s Ex. 3-B & Tr. at 57-58.)  All of the transactions between Decas and the Debtor were through Freeman and Long who were acting as brokers for Decas.  (Tr. at 50.)

During the 90-day period prior to the filing of the petition, the Debtor made the following payments to Decas for the purchase of cranberries:

1.      Invoice No. 014823 dated August 28, 2004, for 288 cases of large, soft and moist sweetened dried cranberries in the sum of $15,120.00.  Payment of this invoice was made by the Debtor by the Check No. 2604091 dated October 29, 2004, in the sum of $15,120.00.  (Pl.'s Ex. 1 & Tr. at 11.)  The Debtor's check cleared the Debtor's bank account on November 10, 2004.

2

(Tr. at 13 & Pl.'s. Ex. 1-A.)  The invoice has printed on its face "Net 30 Days."  (Pl.'s Ex. 1-B.)

2.      Invoice No. 014862 dated September 2, 2004, for 144 cases of diced sweetened dried cranberries in the sum of $9,000.00.  (Pl.'s Ex. 2.)  Payment of this invoice was made by the Debtor by Check No. 264317 dated November 9, 2004, in the sum of $9,000.00.  (Pl.'s Ex. 2-A.)  The check cleared Debtor's bank on November 12, 2004.  (Pl.'s Ex. 2-A.)  The invoice has printed on its face "Net 30 Days."  (Pl.'s Ex. 2-B.)

3.      Invoice No. 015006 dated September 20, 2004, for 144 cases of diced sweetened dried cranberries in the sum of $8,352.00.  (Pl.'s Ex. 3.)  Payment of this invoice was made by the Debtor by Check No. 264994 dated November 26, 2004, in the sum of $8,352.00.  (Pl.'s  Ex. 3-A.)  The check cleared the Debtor's bank account on December 1, 2004.  The invoice has printed on its face "Net 30 Days." (Pl.'s Ex. 3-B.)

Each of the invoices stated above have printed on them the following:

The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)).  The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until payment is received.

## II.  PACA

Decas argues that the product sold to the Debtor is a perishable agricultural commodity covered by the provisions of the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499, et. seq.  If the products are protected by PACA, then the assets forming the PACA trust would be excluded from the bankruptcy estate.

## A.  Facts

A fresh cranberry is a fruit which is perishable and will spoil within a week or two of

3

harvest.  (Tr. at 90.)  The cranberries in question are dried cranberries.  They were harvested in

the fall then frozen and later sliced and soaked in sweetener and then dried.  (Tr. at 91.)  The

effect of this process gives the cranberries a shelf life of 18 months.  (Tr. at 91.)  No

preservatives were added to the product.  (Tr. at 91.) According to the invoices, the product was

transported in cases and described as "moist, sweetened, dried cranberries" or as "dried,

sweetened, diced cranberries."  (Pl.'s Ex. 1-C, 2-C & 3-C.)  The cranberries were shipped from

Massachusetts to Hope, Arkansas, in unrefrigerated trucks.  (Tr. at 52, 93 & 94.)  The shipments

occurred in late August and early September.  The cranberries were shipped at room temperature

although Decas recommends storage at 65 degrees.  (Pl.'s Ex. 1, 2 & 3.)  Since cranberries are

harvested in the fall and the cranberries in question were shipped in late August and early

September, they would necessarily be last year's crop and not freshly harvested cranberries.[2]   To

engage in a transaction involving perishable agricultural commodities requires a license which

both parties to this transaction possessed at all relevant times.  (Def.'s Ex. 2 & Tr. at 54.)

<u>B.  Discussion</u>

Under the terms of PACA, sellers of perishable agricultural commodities are protected

from the risk of nonpayment of buyers by the creation of a statutory trust on all products and

produce; the trust extends to the receivables or proceeds until the produce seller is paid in full.

<u>Tom Lange Co. v. Lombardi Fruit and Produce Co. (In re Lombardi Fruit & Produce Co.)</u>, 12

F.3d 806, 809 (8th Cir. 1994); <u>Sysco Food Services of Seattle v. Country Harvest Buffet</u>

<u>Restaurants, Inc. (In re Country Harvest Buffet Restaurant, Inc.)</u>, 245 B.R. 650, 654 (B.A.P. 9th

_____

[2] See <u>Hiller Cranberry Products, Inc. v. Koplovsky</u>, 165 F.3d 1, 2 (1st Cir. 1999)(court
refers to fresh cranberries as "raw fruit.")

4

Cir. 2000).   In a bankruptcy case, the res of a PACA trust does not become property of the estate until the eligible suppliers are paid in full.  7  U.S.C. § 499e(c)(2);  J. C. Produce, Inc. v. Paragon Steakhouse Restaurants, Inc., 70 F.Supp.2d 1119, 1120 (E.D. Cal. 1999); In re Country Harvest Buffet Restaurant, Inc., 245 B.R. 650, 654 (B.A.P. 9th Cir. 2000); Kurtzman v. CIT Business Credit Corp. (In re N. Merberg & Sons, Inc.), 166 B.R. 567, 570 (Bankr. S.D.N.Y. 1994); In re W. L. Bradley Co., Inc., 75 B.R. 505, 513 (Bankr. E.D. Pa. 1987).  Since PACA trust funds are not property of the estate, sellers of the product covered by PACA have a defense to a subsequent preference action by a trustee.  Ringel Valuation Servs., Inc. v. Shamrock Foods Co. (In re Arizona Fast Foods, LLC), 299 B.R. 589, 596 (Bankr. D.Ariz. 2003); Dairy Fresh Foods, Inc. v. Ramette (In re Country Club Market, Inc.), 175 B.R. 1005, 1010 (Bankr. D.Minn. 1994); 5 Collier on Bankr. ¶ 547.03[2]. See also 11 U.S.C. § 541(b); Drabkin v. Dist. of Columbia, 824 F.2d 1102 (D.C. Cir. 1987); In re Fresh Approach, Inc., 51 B.R. 412 (Bankr. N.D. Tex. 1985).

In order to be protected by PACA, Decas has to show that (1) the goods in question were perishable agricultural commodities, (2) the commodities were received by a commissioned merchant dealer or broker; and (3) they provided written notice of their intent to enforce PACA. In re Country Harvest Buffet Restaurants, Inc., 245 B. R. 650, 653 (B.A.P. 9th Cir. 2000);  In re Fleming Companies, Inc., 316 B.R. 809, 812 (D. Del. 2004); In re Long John Silver's Restaurants, Inc., 230 B.R. 29, 32 (Bankr. Dist. Del. 1999); In re L. Natural Foods Corp., 199 B.R. 882, 885 (Bankr. E.D. Pa. 1996).

PACA defines perishable agricultural commodities to mean "any of the following, whether or not frozen or packed in ice: [f]resh fruits and fresh vegetables of every kind and character." 7 U.S.C. § 499a(4)(A).  The statute does not give a further definition of the term

5

"fresh fruits and vegetables" but Congress gave the Secretary of Agriculture the authority to make such rules and regulations as may be necessary to carry out the provisions of PACA.  7 U.S.C. § 499o.

Pursuant to the authority granted in 7 U.S.C. § 499o, the Secretary of Agriculture has promulgated regulations to assist in defining fresh fruits and vegetables.  The current version of the regulation is contained in 7 C.F.R. § 46.2(u) (2008):

> Fresh fruits and fresh vegetables include all produce in fresh form generally considered as perishable fruits and vegetables, whether or not packed in ice or held in common or cold storage, but does not include those perishable fruits and vegetables which have been manufactured into articles of food of a different kind or character.  The effects of the following operations shall not be considered as changing a commodity into a food of a different kind or character: Water, steam, or oil blanching, battering, coating, chopping, color adding, curing, cutting, dicing, drying for the removal of surface moisture; fumigating, gassing, heating for insect control, ripening and coloring; removal of seed, pits, stems, calyx, husk, pods rind, skin, peel, et cetera; polishing, precooling, refrigerating, shredding, slicing, trimming, washing with or without chemicals; waxing, adding of sugar or other sweetening agents; adding absorbic acid or other agents to retard oxidation; mixing of several kinds of sliced, chopped, or diced fruit or vegetables for packaging in any type of containers; or comparable methods of preparation.

It is clear from the above language that the USDA included within the scope of PACA protection a broad range of processes that are characterized as not altering the essential nature of "fresh fruits and fresh vegetables."  However, many kinds of fresh commodities are removed from the protection of PACA when they are preserved by processing.  Canned commodities are not fresh perishable commodities under the meaning of PACA.  See In re Fleming Companies, Inc., 316 B.R. 809 (D. Del. 2004).[3]  Products which have been processed such as zucchini sticks, breaded cauliflower, frozen onion rings, pickles, and potato products that are treated with either

---

[3] The cranberries here were shipped in some kind of containers, but the record does not show if it was in cans or some other container.

6

an oil spray or a light breading are not subject to PACA trust protection.  Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071 (2nd Cir. 1995).

Dried fruit is not the same as "drying for the removal of surface moisture" as contained in 7 C.F.R. § 46.2(u) (2008).  In re L. Natural Foods Corp., 199 B.R. 882, 888 (Bankr. E.D. Pa. 1996). The court explained why the dried fruits involved did not entitle the seller to become a PACA trust beneficiary:

> [B]oth the sun drying and dehydration procedures employed greatly exceeded the drying for removal of surface moisture exception provided at 7 C.F.R. § 46.2(u). Once employed, the drying processes tangibly affected the fresh commodities by not only extending their shelf life, an arguably permitted effect, but more importantly, by altering their overall consistency, shape, and presumably also their taste.  The result[s] are products that are marketably different from their fresh fruit counterparts.

In re L Natural Foods Corp., 199 B.R. 882, 889-890 (Bankr. E.D. Pa. 1996)

The Fleming court pointed out that the word "fresh" can mean any of the four following: (1) not altered by preserving; (2) not stale, rotted or spoiled or perished; (3) recently made, produced and harvested; and (4) not preserved as by canning, smoking or freezing.  Fleming Companies, Inc. v. U.S. Dept. of Agriculture, 322 F.Supp. 2d 744, 757 (E.D. Tex. 2004).

> According to the Encyclopedia Britannica:
>
> In dehydration, moisture in the fruit is driven off, leaving a stable food that has a moisture content below that at which microorganisms can grow.
> . . . .
>
> Dehydrated fruit has a virtually unlimited shelf life when held under proper storage conditions. Drying does not significantly reduce the calories or minerals, and vitamin losses are similar to other preservation methods. In addition, by reducing the weight and the need for refrigeration, handling and transportation costs can be reduced dramatically. Dehydrated fruits are typically reduced in weight by 75 to 90 percent.
>
> Although dehydration offers a convenient product form, it usually requires a careful inactivation of enzymes. This is usually accomplished by blanching of the

7

fruit or by chemical inactivation. Typically, sulfur dioxide is added for its
antioxidant and preservative effects. In order to control browning, the fruit is
often treated prior to dehydration with sodium sulfite and sodium bi sulfite.

Encyclopedia Britannica (2009), http://www.britannica.com/EBchecked/topic/171553/dried
fruit.

## C.  Analysis

The parties argue vigorously regarding whether Decas provided written notice of their

intent to enforce PACA; however, whether Decas was subject to PACA protection turns on the

initial issue of whether the product in question is a perishable agricultural commodity as

contemplated by the statute.

In this case, there is little evidence regarding the drying process of the cranberries.  The

cranberries were not fresh in the sense of recently harvested or unprocessed.  The processing by

Decas produced a fruit with an 18-month shelf life as opposed to a two-week shelf life and a fruit

that could safely be transported to Arkansas from Massachusetts in the months of August and

September in unrefrigerated trucks.  Even though still fruit, dried cranberries cannot be fresh

fruit or it would surely spoil under these conditions.[4]

Therefore, based on the record presented, the product sold by Decas to the Debtor is not

covered by the terms of PACA because it was not fresh fruit within the meaning of the statute.

It is, therefore, unnecessary to discuss the arguments made regarding whether Decas complied

with the technical requirements of PACA.

## III.  ORDINARY COURSE OF BUSINESS DEFENSE

---

[4] The Court takes judicial notice that the average high temperature in Hope, Arkansas, in
August is 92 degrees Fahrenheit and in September, 85 degrees Fahrenheit.  The average
low temperature is 68 degrees Fahrenheit and 61 degrees Fahrenheit respectively.
(http://weather.yahoo.com/Hope-Arkansas-United-States/USAR0273/statistics.html)

Decas does not dispute the Trustee's proof of the elements of a preference in regard to 11 U.S.C. § 547(b). Decas does raise the affirmative defense of ordinary course of business.

## A. Facts

John David Wankewicz

John Wankewicz testified for Decas. He worked for Decas for three years as Director of Sales and Marketing. (Tr. at 50.) He has no first-hand knowledge of the transactions in question because he was not employed by the company in 2004. (Tr. at 79.) He testified generally as to the company's procedures and produced company records of transactions between the Debtor and Decas.

Decas uses brokers to sell its product and Freeman & Long represents the company to sell to customers in the United States. (Tr. at 50.) Decas' terms were net 30 which meant payment was expected 30 days from the date of the invoice. Decas' major competitor, Ocean Spray, uses the same term of net 30 days. (Tr. at 78.) He repeated several times that Decas does not agree to terms beyond 30 days. (Tr. at 58, 59 & 84.) He stated that 70 to 80 percent of Decas customers pay within normal terms. (Tr. at 58.)

Payments received by Decas that were more than a few days past 30 days were considered "slow pay." (Tr. at 63.) He stated 20 percent of customers in the industry are slow pay. (Tr. at 77.) The ordinary course of business for a slow pay account is that the customer would be contacted by the broker to see when payment would be expected and asked if there were any issues with the order, although contact was not made every time. (Tr. at 63-64 & 75.) He stated that the collection practices of the industry are very much standard, basing his opinion on the three companies he worked for and in talking to competitors as to their payment terms.

9

(Tr. at 75.)

The unsigned credit application between Decas and the Debtors provided that the account was to be paid in full in 30 days. Wankewicz testified that he considered Decas and the Debtor to be in the industrial food market and the industry term of sales are net 30 days. (Tr. at 68.) He stated the industrial food market entails basically the bakery, food processing industry, and further processors of food products. (Tr. at 89.) Based on his personal experience in the industry, Wankewicz described the Debtor's payment history as erratic and that payments made 81 to 59 to 39 days beyond the 30 days "are still beyond their normal terms." (Tr. at 65, 70 & 72.) He then reversed himself saying the range of payments in his industry are anywhere from ten to ninety days. (Tr. at 78.) He explained:

> [W]hen I look at the customer payment histories, we take into account large customers and small customers. We look at, you know, how they have paid their bills. Some of the larger companies will pay very promptly, you know, the multi-national corporations. And some smaller companies that may be struggling for various reasons will, you know, take longer to pay their bills.

(Tr. at 88-89.)

Defendant's Exhibit 15 is a printout of the payment history between Decas and the Debtor beginning August 29, 2002, through November 29, 2004. There was a total of 11 transactions and the average of the days between invoice date and payment date is 62 days including the alleged preferential payments. (Def.'s Ex. 15.) The average not including the alleged preferential payments is 58.88 or 59 days. He stated no unusual collection efforts were undertaken in this case on the three transactions in question although Freeman and Long sent a dunning memo on November 3, 2004, to the Debtor concerning the $15,120.00 transaction and the $9,000.00 transaction. (Pl.'s Ex. 2-E & Tr. at 72-74.) The memo referred to the invoices as

10

"past due" and requested payment.  No threat of legal action or curtailing future shipments was made in the memo.  (Pl.'s Ex. 2-E.)  Wankewicz speculated that the broker would probably have contacted the Debtor by phone about the other past due invoice although no record was kept of phone calls.  (Tr. at 73-74.)   The Debtor paid all invoices by check and none were returned for insufficient funds.  (Tr. at 76.)   He stated that Decas will become directly involved with a customer when the invoice is more than 120 days past due.  (Tr. at 82.)

Debbie Marsh

      Decas also called Debbie Marsh as a witness.  She testified that she worked for the Debtor from 1990 until February 2005 when they filed bankruptcy.  (Tr. at 24.)  She worked in the Accounts Payable Department with two other clerks.  (Tr. at 25.)  She said she has worked in the bakery industry but she does not personally remember any dealings with Decas.  (Tr. at 26-27.)  She explained that 80 percent of the Debtor's sales for the year occur during the fourth quarter, which began in October.  (Tr. at 27 & 32-33.)  Usually in August they start holding payment up to 60 to 90 days waiting for the Thanksgiving and Christmas inventory to sell. (Tr. at 27-28).

      She stated that the normal practice for the Debtor with credit terms of net 30 was that they would write the check in 30 days, but would hold it.  (Tr. at 36.)  Even though Decas' invoices stated that a service charge would be assessed for payments past 30 days, the Debtor never paid any service charge to Decas.  (Tr. at 45.)  Defendant's Exhibit 15 contains the entire history of the transaction between Decas and the Debtor from 2002 through 2004.  The Debtor never once paid an invoice within the 30-day due date.  Payments ranged from 35 days to 102 days.  The three alleged preferential payments were 69, 67, and 70 days after the due date.

11

Decas continued to ship product to the Debtor even though the Debtor was deemed a slow pay. The Debtor never crossed the 120-day threshold which would cause Decas to deal with the Debtor directly.

Ms. Marsh stated that late payments are usually made and "some accept them and some don't." (Tr. at 27.) A common payment term in the industry is 30 days. (Tr. at 28.) However, she also said she has no knowledge regarding whether in the baking industry bills are due and paid in 30 days. (Tr. at 36.) She said in her experience with her current employer, Southern Bakery, most of the terms are 30 days, but "we usually cut a check now in 45 days." (Tr. at 38.) Sometimes the check is cut and held by the maker. (Tr. at 38.) She stated there was no written agreement to extend the payment terms beyond that 30 days between the Debtor and Decas. (Tr. at 48.)

Keith A. Crass

The Trustee offered the testimony of Keith A. Crass, a certified public accountant, who testified that in his opinion the type of business of Decas would be the "wholesale trade industry for farm products, raw material." (Tr. at 103.) In this industry, his records conclude that the average for collection of outstanding accounts is 96.05 days. (Tr. at 105.) He stated that from the information he had he could only testify to the real number of days it takes for the average receivables to be collected in that industry. He could not state what the ordinary business payment terms of the industry are. (Tr. at 114-115.)

B. Discussion

11 U.S.C. § 547(c)(2)(2000) provides as follows:

(c)  Trustee may not avoid under this section a transfer-
     (2)  to the extent such transfer was-

12

> (A)  in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B)  made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C)  made according to ordinary business terms.

A party asserting the provisions of Section 547(c)(2) has the burden of proof to establish the applicability of this section by preponderance of the evidence.  Official Plan Committee v. Expedition Industrial of Washington, Inc. (In re Gateway Corp.), 153 F.3d 915, 917 (8th Cir. 1998); Jones v. United Savings and Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.), 9 F.3d 680, 682 (8th Cir. 1993).

The second element of Section 547(b)(2) requires proof that the transfers to Decas were made in the ordinary course of business or financial affairs of the Debtor and Decas.  Factors to consider include the prior course of dealings between the parties, the timing and amount of the payment, and whether the payment resulted from pressure or any unusual activity by the creditor. 5 Collier on Bankr. ¶ 547.04[2][a][B] at 547-60 (Allen A. Resnick and Henry J. Somers et al, eds., 15th ed. rev. 2008).  A payment that is made beyond invoice or contract terms may still be considered in the ordinary course of business if late payments were the standard course of dealings between the parties.  In re Gateway Pacific Corp., 153 F.3d at 917; Lovett v. St. Jonesberry Trucking, 931 F.2d 494, 497 (8th Cir. 1991).

The third element of Section 547(c)(2) requires Decas to prove that the payments were made according to ordinary business terms.  This section requires an objective determination as to whether the payments are ordinary in relation to the standard prevailing in the relevant industry.  Gulf Coast Work Station Corp. v. Peltz (In re Bridge Information Systems, Inc.), 460 F.3d 1041, 1044 (8th Cir. 2006); In re USA Inns of Eureka Springs, Arkansas, 9 F.3d at 684; 5

13

Collier on Bankr. ¶ 547.04[2][a][c].  The focus should be whether the terms between the parties were particularly unusual in the relevant industry.  In re U.S.A. Inns of Eureka Springs, Arkansas, Inc., 9 F.3d at 685.

C. Analysis

The first element that Decas must prove is that the debt was incurred in the ordinary course of business and financial affairs of the Debtor and Decas.  The Trustee concedes that Decas has established this element of the defense.  The Trustee argues that Decas had the burden of proof on the second element of the ordinary course of business defense and failed to prove the element.

Decas has established that the Debtor's payment, even though considered late according to the printed due date on the invoice, still met the ordinary course of business exception of Section 547(c)(2) because late payments were the established practice between the parties.  See In re Tolova Pizza Products Corp. 3 F.3d 1029, 1032 (7th Cir. 1993); Cox v. American Pan Co. (In re Meyer's Bakeries, Inc.), 387 B.R. 762 (Bankr. W.D. Ark. 2008).  While there was evidence of one mild dunning notice there is no evidence that payment was made in response to any unusual pressure from the creditor.  See Tolz v. Signal Capital Corp. (In re Mastercraft Graphics, Inc.), 157 B.R. 914 (Bankr. S.D. Fla. 1993).

However, Decas has failed to prove that the payments in question were made according to industry standards.  The relevant industry is the wholesale business of buying and selling fruits and vegetables which are farm products.  Decas' principal witness, Mr. Wankewicz, testified repeatedly that the industry terms were net 30 days, that this was standard with the other company he worked for, and standard terms of his competitor.

14

Decas would forfeit protection under PACA if it agreed to written terms beyond 30 days. See Hiller Cranberry Products, Inc. v. Koplovsky, 165 F.3d 1, 5 (1st Cir. 1999); Stowe Potato Sales, Inc. v. Terry's, Inc., 224 B.R. 329, 332 (Bankr. W. D. Va. 1998); 7 C.F.R. § 46.46(e)(2). Wankewicz's testimony that ten to 90 days was the ordinary payment terms for the industry is contradicted by all of his other testimony and is not corroborated by anything in the record. In fact, on cross-examination by the Trustee's attorney, he appeared to recant his testimony. This portion of the witness' testimony is simply not credible.

All of the payments in question were made well beyond the 30-day industry standard adhered to according to the defendant's witness by 80 percent of the industry. This puts the transaction in the 20 percent "slow pay" category; therefore, the payment was not made according to ordinary industry standards. The Debtor and some others marched to their own drummer while 80 percent of the industry paid within the 30-day contract provision.

IV. CONCLUSION

Therefore, for the reasons stated, Decas has failed to establish that PACA applies and has failed to establish  all of the elements of the ordinary course of business defense contained in 11 U.S.C. § 547(c). The Trustee has established all of the elements of a preferential transfer and is therefore entitled to judgment in the sum of $32,473.00.

A separate judgment pursuant to Federal Rule of Bankruptcy Procedure 9010 will be entered in favor of the Trustee.

IT IS SO ORDERED.

_James G. Mixon_

HON. JAMES G. MIXON
U. S. BANKRUPTCY JUDGE

DATE:___02/27/09_____

cc:     Richard L. Cox, Trustee
        Thomas S. Streetman, Esq.
        Frank H. Falkner, Esq.

16